CYRUS INGERSON *v.* JOHN STARKWEATHER AND OTHERS.

An agent, whether of the public or of individuals, who is authorized to sell property, for the best price that can be obtained for it, cannot become the purchaser, either in his own name or that of another, whether the sale be public or private.

To cut off the original parties to a promissory note, in the hands of a third person, the holder must not have received it in payment of an antecedent debt, but he must have parted with something for it at the time, or incurred responsibilities to a third person on the credit of it.

BILL to have certain promissory notes delivered up and cancelled.

April 8th, 1839, complainant purchased of defendant Starkweather, who was then clerk to the Superintendent of Public Instruction, the west half of the northwest quarter of section sixteen, town six south, of range ten west, and executed to him the notes in question, payable to him or order, in part payment. The lot purchased was a part of the school lands belonging to the state. By law, the Superintendent of Public Instruction was required *to sell* all school lands at public auction, at not less than eight dollars per acre; and, after having offered them twice in that way, in different years, without finding a purchaser, he was to sell them at that price, at private sale. The bill charged that Starkweather called on complainant, and offered to sell him the lot, stating that he had purchased it, at one of the public sales, at eight dollars per acre; that no certificate had been given him for it, but that he had blank certificates by him, signed by the Superintendent, and, if they could make a bargain, he would fill up one to the complainant. That complainant, confiding in these representations, purchased the lot, and agreed to pay the eight dollars per acre to the school fund, and three

hundred and twenty dollars to Starkweather, for which last sum he executed to him his three promissory notes; and Starkweather filled up and delivered to him the following certificate:

"In the name of the people of the State of Michigan, I, John D. Pierce, Superintendent of Public Instruction, agreeable to the provisions of chapter one, title twelve, of the revised statutes, hereby certify, that at a private sale held pursuant to the statute aforesaid, on the eighth day of April, A. D. 1839, Cyrus Ingerson, of St. Joseph county, Michigan, for the sum of $640, has purchased the following described land, to wit, west half of the northwest quarter of section number sixteen, in township number six south, range ten west, containing eighty acres, according to the returns of the Surveyor General, at eight dollars per acre.  And I do further certify that the consideration received therefor from the said purchaser, is the sum of sixty-four dollars, and that the consideration to be paid by the said purchaser is the sum of five hundred and seventy-six dollars, in nine equal annual payments, at an interest of seven per centum, to be paid annually at the office of said Superintendent of Public Instruction ; and said instalments may be paid before the same shall become due, by giving three months' previous notice to the said Superintendent.  And in case of the non-payment of the said interest annually, and in case of the non-payment of the said instalments as they become due, by the said purchaser, or by any other person claiming under him, then this certificate shall be void and of no effect, and all the interest of the said Cyrus Ingerson, or of any person or persons claiming under him, to the aforesaid described land, shall be absolutely void, and the full title to such land, and the right to the possession thereof, shall revest in the state; and the said Superintendent may take pos-

session thereof, and sell the same, pursuant to the provisions of the chapter and title of the revised statutes aforesaid. Given under my hand and seal this eighth day of April, 1839."

The bill then charged that the lot had not been purchased by Starkweather, as stated by him, and that it had twice been offered for sale at public auction without being sold. It further stated that Starkweather had transferred the notes to Willard, without consideration; and that Willard had notice of the circumstances under which they had been given when he took them.

Starkweather admitted the sale of the lot, and the giving of the certificate, as stated in the bill. Denied that he represented himself to be the purchaser. Admitted he told complainant that he and John Norton, Junr. had purchased it, and that they had received no certificate; and that, if he wished to buy it, he could fill up a blank certificate to himself, and then transfer it to complainant, who must pay him $384, and take it subject to all payments to the school fund except the first. Complainant agreed to it; and, at his request, he filled up the certificate directly to him, to avoid the trouble and expense of an assignment from himself to complainant. He and Norton became the purchasers of the lot, October 17th, 1838, at a public auction at which he acted as auctioneer. The lot was struck off to Norton as purchaser, but for the benefit of Norton and himself; and minutes of the sale were entered in the book of sales, in pencil mark, as was customary at such sales. The Superintendent was not present at the sale. Defendant made the first payment on the land, amounting to sixty-four dollars. On the delivery of the certificate, complainant executed to him four promissory notes;—one for sixty-four dollars, payable with interest on the first day of September thereafter;—

one for one hundred dollars with interest payable on the first day of January thereafter,—one for one hundred dollars, payable in one year, and one for one hundred and twenty dollars, with interest, payable in two years from the first day of January thereafter.   About a month after these notes were given, the last three of them were exchanged with complainant, at his request, for three others bearing date April 8th, 1839, viz : one for one hundred dollars, payable in one year, one for one hundred dollars payable in two years, and one for one hundred and twenty dollars payable in three years, from and after the first day of January, 1840, with interest.   On December 20th, 1839, these last notes were transferred to Willard, in good faith, in consideration and payment of professional services previously rendered, and subsequently to be rendered.

Willard denied he had any knowledge, information, belief, or suspicion, that the notes had been executed under the circumstances stated in the bill, when they were transferred to him.   He purchased them in good faith, December 20th, 1839.   They were taken by him in payment of professional services rendered and to be rendered.   He was, at the time, foreclosing a mortgage for Starkweather, who would be indebted to him $40 on that account when completed, and he had previously rendered other services to the amount of $5.   At the time of putting in his answer, he had many demands in his hands for collection, and suits to prosecute, for Starkweather, who was then indebted to him for professional services about one hundred dollars, and would be indebted to him, when the whole of said business was brought to a close, in all, about two hundred dollars.   He had no knowledge of any difficulty between complainant and Starkweather about the notes, until some time in May, 1840, when he was spoken to on the subject by complainant's solicitor.

Replications were filed to the answers, and the cause was heard upon the pleadings.

*L. F. Stevens*, for complainant.

*E. Bradley*, for defendants.

THE CHANCELLOR. The complainant is entitled to relief. Starkweather represented himself as the owner of the lot, or that it belonged to himself and Norton, when he sold it to complainant. In what way, according to his own statement, did they acquire an interest in it? By purchasing it at a public auction conducted by himself, as agent and auctioneer for the state. He could not, without a breach of his duty to the state, purchase at such sale. It is contrary to every sound principle of equity, to allow an agent, who is authorized to sell property for the best price that can be obtained for it, to become the purchaser himself. It is immaterial whether the sale be public or private; whether the agent purchase in his own name or that of another. The object of the rule is to secure fidelity on the part of the agent to his principal; and it is as applicable to public agents as others, and should, if any thing, be enforced more rigidly against them, as they have greater opportunities of abusing their trust.

Starkweather appears to have been aware of the impropriety of his appearing as a purchaser at the sale, for the lot was bid off in Norton's name alone, although Starkweather was to have an interest in it. Was Norton at the sale, and did he bid it off? The answer is silent on this point. Defendant was interrogated by the bill as to what persons were present at the sale;—he names some two or three, but, says not a word about Norton. Neither does he say in express terms Norton was the purchaser. His language is that "the land was struck off to John Norton,

Junr., *as the purchaser*, for the benefit of himself the said defendant, and John Norton, Junr."

Suppose the sale genuine : Norton and Starkweather, by omitting to comply with the terms of the sale, had ceased to have any interest in the lot, when it was sold to complainant.    The law required one tenth of the purchase money to be paid in cash, and the remainder of it in annual instalments of ten per cent, at an interest of seven per cent, to be paid annually.    *R. S.* 251.    The first payment was not made at the sale, nor until Starkweather had sold to complainant.    This is clearly to be inferred from Starkweather's answer, and if the fact had been otherwise, he would probably have stated it.    The public sale was on October 17th, 1838; and on the 8th day of April, 1839, nearly six months after, when he sold to complainant, he and Norton had not procured a certificate. In his answer, he says, he proposed to sell the lot to complainant, " subject to all payments excepting the first, *to be made* to said Superintendent."    In another part of his answer he says that " he paid to the said Superintendent the sum of sixty-four dollars, being the first payment to be made on the purchase of lands, according to the law regulating the sale of said school lands ; but at what time, whether before, or after he sold to complainant, he does not state.    The certificate to complainant is dated April 8th, 1839, instead of October 17th, 1838, when the public sale took place ; the state thereby losing nearly six months' interest.    Why was not the certificate dated back to the time of the public sale ?    Why does it state the land was sold " at a private sale"?

I do not rest my decision on this ground alone, but on another and stronger ground; that the sale of October 17th was not a *bona fide* sale, but intended to stand as such if the land could be sold to advantage; otherwise to

be abandoned. The circumstances already stated show this pretty conclusively to my mind, but there are others. Norton does not appear to have ever had any thing to do with the purchase. He was not at the public sale, nor does it appear that he had an agent there. He had nothing to do in making the bargain with complainant; the notes were made payable to Starkweather, or order, and were afterwards transferred by him to Willard, under circumstances that exclude all idea of Norton's having any interest in them. We hear nothing of Norton in these transactions, or in the payment of the sixty-four dollars to the Superintendent.

The land having been twice offered for sale at public auction, without being in fact sold, was subject to private sale, at the minimum price of eight dollars per acre; and complainant, or any other person wishing to purchase it, was entitled to it at that price. Complainant was induced to pay more for it by reason of the representations of Starkweather, that it belonged to him, when in fact it belonged to the state.

Willard cannot be regarded as the holder of the notes for a valuable consideration, and without notice, to a greater amount than the value of the services rendered by him, under the agreement with Starkweather, before he had notice of the manner in which they had been obtained. He gave neither money nor property for them. He took them in payment of an antecedent debt, and professional services to be rendered. So far as such services were rendered before notice to him, he is entitled to the protection of the Court; but no further. To cut off the equities of the original parties to a note, in the hands of a third person, the holder must not have received it in payment of an antecedent debt, but he must have parted with something for it at the time, or incurred responsibilities to

a third person on the credit of it.  *Rosa* v. *Brotherton*, 10 *Wend. R.* 85 ; *Wardell* v. *Howard*, 9 *Wend. R.* 170 ; *Codington* v. *Bay*, 20 *J. R.* 637 ; *Hart* v. *Palmer*, 12 *Wend. R.* 523.

The services rendered by Willard before notice cannot amount to a great deal, but there must be a reference to a Master to ascertain the amount.